IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

KARA KOWALSKI,

       Plaintiff,

v.                                                    Civil Action No. 3:07-CV-147
                                                     (Judge Bailey)

BERKELEY COUNTY PUBLIC SCHOOLS, and
MANNY P. ARVON, II, Superintendent, in his official capacity,
RONALD STEPHENS, Principal, in his official capacity and individually,
BECKY J. HARDEN, Vice Principal, in her official capacity and individually,
BUFFY ASHCROFT, Cheerleading Coach, in her official capacity and individually,
and RICK DEUELL, Assistant Superintendent, in his official capacity.

       Defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ISSUE OF VIOLATION OF DUE PROCESS RIGHTS

**I.**     **INTRODUCTION**

On this day, the above-styled civil action came before this Court upon Defendants, the Berkeley County Board of Education ("the Board"), Manny P. Arvon, II, Ronald Stephens, Becky J. Harden, Buffy Ashcroft and Rick Deuell's ("Defendants") Motion for Summary Judgment [Doc. 104], Plaintiff's Response thereto [Doc. 122], Defendants' Reply [Doc. 136], and Plaintiff Kara Kowalski's ("Plaintiff") Motion for Summary Judgment on Issue of Violation of Due Process Rights [Doc. 105] and Defendants' Response thereto [Doc. 113]. This Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that the Defendants' Motion for Summary Judgment [Doc. 104] should be **GRANTED**, and the

Plaintiff's Motion for Summary Judgment on Issue of Violation of Due Process Rights [Doc. 105] should be **DENIED**.

## II.    <u>BACKGROUND</u>

This case arises out of events which took place on December 1 and 2, 2005. On December 1, 2005, the plaintiff, then a Mussellman High School senior, created a MySpace page from her home computer in which she invited approximately one hundred (100) people to join. The forum was entitled "S.A.S.H.," an acronym which stood for "Students Against Sluts Herpes." The MySpace page singled out another Mussellman High School ("Mussellman") student, S.N.,[1] for ridicule and scorn. Several comments and altered photographs of Ms. N. were uploaded by the invitees to the plaintiff's MySpace page. Ms. N. and her parents became aware of the plaintiff's MySpace page, and the next day, during school hours, Ms. N. and her parents came to Mussellman to file a complaint against the plaintiff and the other Mussellman students involved in posting derogatory comments and pictures of Ms. N. to the plaintiff's MySpace page. The plaintiff and several of her MySpace page invitees were called to the office and given an opportunity to explain their sides of the stories. Importantly, the plaintiff admitted that she created the website. As a result of her conduct, the plaintiff received a disciplinary referral form describing her offense and imposing as discipline a ten (10) day school suspension and ninety (90) day social suspension. This "social suspension" precluded her from participating in "Charm Review" and cheerleading, both of which this Court addressed and disposed of in its Order dismissing the portions relating thereto [Doc. 55]. The plaintiff's father contacted a Board of Education

---

[1]    To protect the identity of the student portrayed on Plaintiff's S.A.S.H. Website, this Court will refer to her only as "S.N." or "Ms. N."

2

employee and requested a reduction in the plaintiff's suspension. As a result of these efforts, the plaintiff's suspension was reduced by half.

### III.   <u>PROCEDURAL HISTORY</u>

The Plaintiff initiated this litigation by filing her original complaint in this Court on November 9, 2007 [Doc. 1]. Plaintiff sought to file an Amended Complaint and, on June 10, 2008, this Court granted her leave to file an Amended Complaint. [Doc. 34]. The Amended Complaint was served on or about June 11, 2008, and expanded the original Complaint, which had contained four counts for relief, to include seven counts for relief [Doc. 35].

The Amended Complaint contained seven claims: four claims arising under 42 U.S.C. § 1983 alleging State and Federal Constitutional violations; one count sought a declaratory judgment that the Berkeley County Board of Education Harassment, Bullying, and Intimidation Policy is unconstitutionally overbroad and/or ambiguous; one count sought an injunction to force Defendant School Board to expunge Plaintiff's disciplinary referral, notation of suspension, and any other documents related to the discipline and suspension from her school record and to send corrected copies to any third parties to whom transcripts or school records containing references to the discipline or school suspension were sent; and the final count alleged negligent, wanton, reckless and malicious infliction of emotional distress. On June 25, 2008, Defendants filed a motion to dismiss Plaintiff's Amended Complaint.

By Order dated October 20, 2008, this Court granted in part and denied in part the Defendants' Motion to Dismiss the Plaintiff's Amended Complaint [Doc. 55]. This Court dismissed the plaintiff's claims for violations of her 1st Amendment rights, the

plaintiff's 5th Amendment Due Process claim regarding her suspension from extracurricular activities, the plaintiff's 8th Amendment cruel and unusual punishment claim, the plaintiff's claim for declaratory judgment, and the plaintiff's claims for negligent and intentional infliction of emotional distress.

IV.   **UNDISPUTED MATERIAL FACTS**

The Undisputed Material Facts, taken in the light most favorable to the plaintiff, are as follows:

A.   **The 2005-2006 Berkeley County Schools Student Handbook**

1)   At the beginning of each of the plaintiff's four school years at Musselman High School, she received a copy of the Berkeley County Schools Student Handbook ("the Handbook").  See Excerpts Deposition of Kara Kowalski [Doc. 104-2] at 23.

2)   According to § III of the Student Code of Conduct contained in the Handbook for the 2005-2006 school year, "Students will help create an atmosphere free from bullying, intimidation, and harassment." See Affidavit of Becky J. Harden and Student Handbook [Doc. 104-3] at 63.

3)   The significant section of the Student Code of Conduct is highlighted by the "Harassment, Bullying, and Intimidation Policy" (the "Policy"). Id. at 84-91.

4)   The Policy fairly informs students of actions that may subject them to punishment under the Policy:

Bullying, Harassment, and/or Intimidation is any intentional gesture, or any intentional written, verbal or physical act that:

1.   A reasonable person under the circumstances should know will have the effect of:

a. Harming a student or a staff member; . . .

2. Is sufficiently inappropriate, severe, persistent, or pervasive that it creates an intimidating, threatening, or abusive educational environment for a student.

Id. at 86.

5) The Policy also informs students that violation of the policy can result in, *inter alia*, suspension. Id. at 88.

6) Finally, the Policy outlines the right to appeal any disciplinary action taken pursuant to the Policy.  Id.

**B.   Events leading up to Plaintiff's Suspension**

7) The plaintiff, Kara Kowalski, was enrolled as a student at Musselman High School during the 2005-2006 academic year. [Doc. 104-2] at 22-23.

8) The plaintiff created a webpage on MySpace.com from her home computer on or about December 1, 2005, entitled "S.A.S.H.", which, according to the plaintiff, stands for "Students Against Sluts Herpes." Id. at 29-30.

9) The plaintiff identified herself as the moderator under her username "Rising Fame." Id. at 55.

10) Once the plaintiff completed her website, she sent invitations to visit her website to approximately one hundred of her MySpace contacts, many of whom were students at Musselman.  Id. at 33.

11) Despite its generic appellation, the "S.A.S.H." webpage singled out one particular Mussellman student, S. N. See Exhibit No. 2 to the Deposition of Becky J. Harden, Printouts from the "S.A.S.H." Webpage. [Doc. 104-4].

12) One picture posted to the chat room depicts two members of S.A.S.H. holding up a sign that states, "[S.N.] HAS HERPES." Id.

13)    Plaintiff Kowalski a/k/a "Rising Fame" responded to the picture by stating, "This is the best picture I've seen on myspace so far! ! !"[2] Id.

14)    Other postings from the plaintiff's invitees followed. One invitee, under the name "You can Hate Me Now,"[3] stated, "[Sic] hey danielle and amy S. knows about the sign cus tj told me she knows and I was like wait til she sees the page lol".[4] Id.

15)    In response, another invitee, under the name "A-my,"[5] stated, "[Sic] Haha.. screw her. . . . This is great This is f--king great lol This is f--king great lol". Id.

16)    Yet another invitee, under the name "We all live in a yellow submarine," wrote, "[Sic] ha this group is funny….your (sic) so awesome kara [the Plaintiff herein]…i never thought u would mastermind a group that hates sum1 tho, lol….you just seem like the quiet nice type, lol". Id.

17)    Ray Parsons, one of the plaintiff's invitees to the chat room, posted two pictures of Ms. N. under the "Pictures of S.A.S.H." section of the plaintiff's webpage. [Doc. 104-2] at 70-71.

18)    Mr. Parsons altered the first picture by adding red dots around Ms. N.'s mouth to create the appearance that Ms. N. had herpes. See [Doc. 104-2] at 39 and [Doc. 104-4].

19)    Additionally, Mr. Parsons added a banner across Ms. N.'s pelvic area that reads, "Warning: Enter at your own risk" [Doc. 104-4].

---

[2]   While the plaintiff has no specific memory of posting this message, she was admittedly aware of the posting and took no action to identify the author or to remove or correct the statement.
[3]   "You can Hate Me Now" is the username of Ray Parsons.
[4]   "lol" is a shorthand expression for "laugh out loud."
[5]   "A-my" is the username of Amy Mason.

20)    Mr. Parsons placed a banner in the lower right hand corner of a second picture of Ms. N. that reads, "portrait of a whore." Id.

21)    Mr. Parsons admittedly made these postings to the plaintiff's MySpace page while he was sitting in night school. Id.

C.    **In-School Disruption**

22)    Soon after the plaintiff created her chat room, Mr. Parsons informed the plaintiff he received a call from Ms. N.'s father demanding that the pictures be removed. [Doc. 104-2] at 37-38.

23)    The following day, which was a school day, Ms. N. and her parents came to Musselman to submit a harassment complaint against the plaintiff for creating and hosting and the chat room. See Excerpts from the Deposition of Becky Harden [Doc. 104-5] at 15.

24)    Ms. N.'s parents met with Mr. Stephens, the school's principal, and he asked Ms. Harden, the vice-principal, to pull the proper forms and bring them to the main office.  Id.

25)    Ms. N.'s parents completed the complaint forms and returned them to Ms. Harden. Id. at 17.

26)    Ms. N. then left the school with her parents because she did not feel comfortable sitting in class with the very people who had posted messages to the plaintiff's chat room. Id. at 62-63.

27)    After the forms were submitted, Ms. Harden met with Mr. Stephens to determine the proper procedure to follow. Id. at 23.

28)     Mr. Stephens and Ms. Harden then contacted the Board Office to determine whether or not the plaintiff's conduct constituted a school issue, and a decision was made to continue with the disciplinary process. Id. at 37-40.

29)     Ms. Harden then began interviewing the students involved with the plaintiff's chat room. Id. at 23-24.

30)     In order to accomplish each of these interviews, students were required to be called from class to present their side of the story to the school. Id. at 29.

31)     Ms. Harden recalled interviewing Ms. Kowlaski, Mr. Parsons, and Ms. Mason.  Id. at 41.

**D.     Disciplinary Action**

32)     The plaintiff met with Ms. Harden and was informed that she was being punished for her Myspace webpage. [Doc. 104-2] at 86.

33)     Importantly, during this meeting, the plaintiff admitted that she created the MySpace webpage.  Id. at 87-88.

34)     Ms. Harden then called the plaintiff's mother and informed her that her daughter was being sent home. Id. at 86.

35)     The plaintiff also was informed that she would be suspended from school for ten (10) days and receive a ninety (90) day social suspension. Id. at 86-87.

36)     The plaintiff was provided with a Student Disciplinary Referral Form that specified the offense for which she was being suspended, "harassment / bullying / intimidation / hate- creating a hate chat room against another student." [Doc. 104-6].

37)     The plaintiff signed the form and went home. [Doc. 104-2] at 87.

38)     Several other students who posted messages on the plaintiff's chat room also received three (3) day suspensions.  Id. at 91.

39)     Ray Parsons, the student who altered and posted the pictures regarding Ms. N., was transferred to transitional school, which is a harsher punishment than that given to the plaintiff.  Id. at 91-92.

### E.     Appeal of Disciplinary Action

40)     Shortly after the plaintiff's meeting with Ms. Harden, her father made several phone calls to school officials in an effort to reduce the plaintiff's suspension. Id. at 95.

41)     After receiving repeated calls from the plaintiff's father, her suspension was reduced by half.  Id. at 100-101.

## V.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[2] Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial-- whether, in other words, there are any genuine factual issues that properly can be

---

[1] FED. R. CIV. P. 56(c); see **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).

[2] **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 250 (1986).

resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[3]

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."[4]   That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.[5]   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[6]

Finally, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.


VI.   **CONCLUSIONS OF LAW**

   A.   **Plaintiff failed to present a genuine issue of material fact with regard to her Due Process claims under the 5th Amendment to the United States Constitution or Article III, § 10 of the West Virginia Constitution because the plaintiff was on notice that her conduct could be punished, and she was provided with an opportunity to be heard prior to her suspension.**

   1)   The plaintiff claims that Defendants violated her right to Due Process under both the United States and West Virginia Constitutions in two different ways.

---

[3]   *Anderson*, 477 U.S. at 250.

[4]   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[5]   Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323-25; *Anderson*, 477 U.S. at 248.

[6]   *Anderson*, 477 U.S. at 249 (citations omitted).

2)      First, the plaintiff claims that she had no notice that she could be disciplined for her private, out of school use of the Internet.

3)      Second, the plaintiff claims that she was not provided with an opportunity to appeal her suspension.

### 1. The Plaintiff was on notice that she could be punished for her off-campus behavior based on the foreseeability that her chat room could cause a disruption at school.

4)      From the outset, it is significant to note that, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 685, 106 S.Ct. 3159, 3166 (1986).  Further, one of the distinctions between adults and children stressed by the Supreme Court was the legitimacy of protecting minors from exposure to vulgar language.   These twin decisional rules, i.e., the validation of the school's role in teaching civilized behavior and the lesser First Amendment rights of minors, caused the Court to conclude that "schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct."  *Fraser*, 478 U.S. at 683.

5)      In an effort to provide students with adequate notice of proscribed behaviors, each student receives a copy of the Berkeley County Schools Student Handbook ("Handbook").

6)      The plaintiff testified in her deposition that she received a copy of the Handbook each of the four years that she attended Musselman.

7)     The plaintiff also testified that she signed an acknowledgment of receipt for the Handbook each year.

8)     The 2005-2006 Handbook contains an entire section outlining the policy prohibiting the bullying, intimidation, and harassment of students.

9)     Despite her admitted receipt of official school policy prohibiting the bullying, intimidation, and harassment of other students, the plaintiff argues that her conduct occurred outside of school and she therefore did not know that the defendants could punish her for her actions.

10)    The plaintiff's subjective knowledge, however, does not measure boundaries of the defendants' ability to regulate student behavior. School officials may regulate off-campus behavior insofar as the off-campus behavior creates a foreseeable risk of reaching school property and causing a substantial disruption to the work and discipline of the school.  *See **Doninger v. Niehoff**,* 527 F.3d 41 (2nd Cir. 2008).

11)    The Second Circuit Court of Appeals reached this conclusion in ***Doninger v. Niehoff***, 527 F.3d 41:

> We begin with some basic principles. It is axiomatic that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." ***Tinker v. Des Moines Indep. Cmty. Sch. Dist.***, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). It is equally the case that the constitutional rights of students in public school "are not automatically coextensive with the rights of adults in other settings," ***Bethel Sch. Dist. No. 403 v. Fraser***, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), but must instead be applied in a manner consistent with the "special characteristics of the school environment," ***Tinker***, 393 U.S. at 506, 89 S.Ct. 733. **Thus, school administrators may prohibit student expression that will "materially and substantially disrupt the work and discipline of the school**." *Id.* at 513, 89 S.Ct. 733. **Vulgar or offensive speech-speech** that an adult making a political point might have a constitutional right to employ-**may legitimately give rise to disciplinary action by a school, given the school's responsibility for**

> **"teaching students the boundaries of socially appropriate behavior**." ***Fraser***, 478 U.S. at 681, 106 S.Ct. 3159.

***Doninger***, 527 F.3d at 48 (emphasis added).

12)      The Second Circuit then considered the applicability of the foregoing precedent to instances of off-campus behavior:

> ***Tinker*** provides that school administrators may prohibit student expression that will "materially and substantially disrupt the work and discipline of the school." ***Tinker***, 393 U.S. at 513, 89 S.Ct. 733. In ***Wisniewski***, we applied this standard to an eighth grader's off-campus creation and Internet transmission to some fifteen friends of a crudely drawn icon that "depict[ed] and call[ed] for the killing of his teacher." 494 F.3d at 38. **We recognized that off-campus conduct of this sort "can create a foreseeable risk of substantial disruption within a school" and that, in such circumstances, its off-campus character does not necessarily insulate the student from school discipline**. *Id.* at 39. **We determined that school discipline was permissible because it was reasonably foreseeable that the icon would come to the attention of school authorities and that it would create a risk of substantial disruption**. *See id.* at 39-40.

***Id.*** at 50 (emphasis added).

13)      After applying this framework to the student council member's off-campus blog posting, the Second Circuit affirmed the district court's ruling and concluded that it was reasonably foreseeable that the posting would reach school property. In relation to the disruptive nature of the message, the Second Circuit noted:

> As the Sixth Circuit recently elaborated, "[s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." ***Lowery v. Euverard***, 497 F.3d 584, 596 (6th Cir. 2007); *see also* ***LaVine v. Blaine Sch. Dist.***, 257 F.3d 981, 989 (9th Cir. 2001) ("***Tinker*** does not require school officials to wait until disruption actually occurs before they may act."). **The question is not whether there has been actual disruption, but whether school officials "might reasonably portend disruption" from the student expression at issue**. *LaVine*, 257 F.3d at 989; *see also* ***Nuxoll v. Indian Prairie Sch. Dist. # 204***, 523 F.3d 668, 673 (7th Cir. 2008).

13

*Id.* at 51 (emphasis added).

14)     As noted in **Doninger**, the United States Supreme Court recognizes that schools have a responsibility for teaching students the boundaries of socially appropriate behavior. *See **Fraser***, 478 U.S. at 681.

15)     Thus, schools may legitimately take disciplinary action against a student for vulgar or offensive speech. *See **id***. at 683.

16)     In the present case, the plaintiff created a chat room the purpose of which she claims was to raise awareness regarding sexually transmitted diseases. The website, however, provides absolutely no educational value; rather, its end result served to accomplish no more than to harass Ms. N..  Regardless of whether it was apparent at the time Ms. Kowalski created this webpage that its purpose was not to raise legitimate STD awareness, she most certainly became aware when the pictures and postings were uploaded, and she made no efforts to stop them.  Rather, Ms. Kowalski actually praised the harassment of her fellow classmate when she posted the comment "this is the best picture I've seen on MySpace so far ! !"

Although the plaintiff maintains the webpage contained nothing that incited or encouraged anyone to do anything, this Court finds this contention completely without merit.  Indeed, this Court needs to look no further than to the name Ms. Kowalski entitled the website; that is, "Students Against Sluts Herpes," to determine its true purpose. A webpage with this title can only be deemed to have been created for the purpose of inviting others to indulge in disruptive and hateful conduct. Needless to say, the ultimate result of the webpage was in fact the singling out of S. N., one of the

plaintiff's classmates, for bullying harassment, and intimidation by portraying her as a "slut" with "herpes."

17)    The plaintiff's chat room included pictures and postings claiming that Ms. N. had herpes and was a whore.

18)    Based on *Fraser*, *supra*, the defendants could legitimately take action for the plaintiff's vulgar and offensive speech and her encouragement of other students to follow suit.

19)    The next step in the *Doninger* analysis requires an assessment of the foreseeeablilty that the off-campus conduct would reach the school.

20)    In the present case, it was more than reasonably foreseeable that invitations to the plaintiff's chat room and the chat room itself would find their way into Musselman High School; based on the proliferation of personal electronic devices with web browsing capabilities such as laptops, cell phones, and personal data assistants, it was inevitable.

21)    This conclusion is reinforced by the fact that the majority of the plaintiff's invitations to participate in the webpage were sent to the plaintiff's classmates.

22)    In fact, Ray Parsons, one of the plaintiff's classmates, made several postings to the plaintiff's chat room from class.

23)    The last step in the *Doninger* analysis requires an assessment of the foreseeeablilty that the off-campus conduct would create a substantial disruption in the school.

24)    In the present case, it was more than reasonably foreseeable that the plaintiff's chat room would create a risk of substantial disruption within the school. In

fact, this behavior did create a substantial disruption within the school.  To name a few, the principal, vice-principal, several teachers, and the Board of Education expended their time and resources sorting out this matter.  Additionally, Ms. N.'s parents had to file a complaint and come to the school.  Of course, several phone calls were made by the plaintiff's father, which resulted in a reduction of the plaintiff's suspension. Several, if not all, of the twelve or so students involved in the pictures and/or postings were called into the principal's office to be interviewed.  Finally, Ms. N. felt she had to leave school due to the embarrassment she endured as a result of this very serious attack on her reputation.

25)    Although the plaintiff created her chat room at her home, the chat room was accessible from anywhere in the world that provides either internet connectivity or cell phone service, including Musselman High School.

26)    Additionally, the plaintiff sent out over one hundred (100) invitations to her MySpace contacts, many of whom were fellow students at Musselman High School.

27)    Based on the cruel and mean-spirited content on the plaintiff's chat room, it was reasonably foreseeable that the plaintiff and/or her MySpace group would harass, bully, and/or intimidate Ms. N. during school.

28)    A single comment or reference to the plaintiff's chat room during school or any school related activity could foreseeably create a substantial disruption.

29)    Such a conclusion is inescapable in light of the fact that Ms. N. was so embarrassed and intimidated by the plaintiff's chat room and the comments and pictures contained therein, that she had to go home for the rest of the day once she made her formal complaint.

30)    For these reasons, the plaintiff failed to present a genuine issue of material fact with regard to her claim that she was denied Due Process because she was not on notice that her off-campus conduct could lead to the disciplinary action ultimately imposed by the defendants. *See **Doninger**, supra.* Therefore, this Court hereby **GRANTS** the defendants summary judgment on this claim.

### 2. The plaintiff received a higher degree of due process than that required by the 14th Amendment to the United States Constitution.

31)    The United States Supreme Court examined the extent of a student's procedural Due Process guarantees under the 14th Amendment in the context of suspensions in **Goss v. Lopez**, 419 U.S. 565, 95 S.Ct. 729 (1975).

32)    In that case, the Supreme Court examined an Ohio statute that allowed for the suspension of a student for up to ten (10) days without an opportunity to be heard. After affirming that students facing a suspension of ten (10) days or less have interests within the purview of the Due Process Clause, the Supreme Court provided a detailed explanation of procedural Due Process requirements:

> We do not believe that school authorities must be totally free from notice and hearing requirements if their schools are to operate with acceptable efficiency. Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and **due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.** The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.
>
> There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, **in being given an opportunity to**

**explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.**

. . . .

We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident. Brief disciplinary suspensions are almost countless. **To impose in each such case even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness.** Moreover, further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.

*Goss*, 419 U.S. at 583 (emphasis added).

33)     In the case at bar, the plaintiff admits that she was called to the office the day after she created her chat room and given oral notice of the charges against her.

34)     The vice principal informed the plaintiff that she was going to be suspended for the creation of the plaintiff's chat room, thereby fulfilling the *Goss* requirement that she be afforded an explanation of what she was accused of doing and the basis of that accusation.

35)     The plaintiff then admitted that she had created the chat room, thereby giving up her opportunity to present her side of the story, which the plaintiff so desperately seeks to do. *Id*.  This Court further notes that Ms. Kowalski has had ample opportunity to explain exactly what her side of the story was throughout the course of this litigation; however, finds the record devoid of any account of the events which would change this Court's findings.

36)     The defendants provided the plaintiff with, and the plaintiff signed, a Student Disciplinary Referral Form, which specified the conduct for which the plaintiff was being punished.

37)     The punishment levied against plaintiff was a ten (10) day suspension. Based on **Goss**, *supra*, the plaintiff received all the process she was due under the United States Constitution.  As noted above, **Goss** held that all due process requires is "that the student be given **oral** . . . notice of the charges against h[er] . . ." (emphasis added).  This, the plaintiff received.

38)     Similarly, **Goss** further adds that "an explanation of the evidence the authorities have and an opportunity to present h[er] side of the story" exist only "if [s]he denies [the charges]."  *Id*. at 741.  It is well established that Ms. Kowalski admitted to having created the webpage.  Thus, any argument regarding her lack of a formal hearing is moot as she had no entitlement to the same.

39)     But the plaintiff's Due Process options did not end there. Although not required by the United States Constitution, the Harassment, Bullying, and Intimidation Policy contains an appeal provision.

40)     Despite this fact, neither the plaintiff nor her parents inquired about or invoked the formal appeal provision, which was clearly contained within the Handbook.

41)     Instead, the plaintiff's parents contacted the Berkeley County School Board's office in an effort to reduce or eliminate the plaintiff's suspension. Based on this contact, the plaintiff's suspension was, in fact, reduced by half.

42)     It was more than reasonable for the school board to forgo further investigation given Kowalski's waiver of the same when she admitted the charges.

Whether a student "admitted the charges" against her is "relevant in determining substantial prejudice or harm." ***Keough***, 748 F.2d at 1083.  Simply put, once a student has admitted h[er] guilt, the need for a hearing is substantially lessened. *See **Watson v. Beckel***, 242 F.3d 1237 (10th Cir. 2001)(adopting the reasoning of ***Keough*** in holding that a student who was expelled without being afforded sufficient process was not prejudiced because he admitted his guilt); *see also **Black Coalition v. Portland Sch. Dist. No. 1***, 484 F.2d 1040, 1045 (9th Cir. 1973) (student not entitled to relief on due process claim because he "admitted all the essential facts which it is the purpose of a Due Process hearing to establish").

43)     Because the plaintiff was notified of the basis for her punishment and given an opportunity to explain her side of the story prior to receiving her ten (10) day suspension, she received all the Due Process guaranteed to school students by the United States Constitution. *See **Goss***, *supra*.

44)     Moreover, the defendants went above and beyond Constitutional mandates and provided the plaintiff both a formal and an informal opportunity to appeal her suspension.

45)     As a result of an informal appeal by the plaintiff's parents, this suspension was reduced by half.

46)     Thus, the plaintiff fails to present a genuine issue of material fact with regard to her 14th Amendment procedural Due Process claim. Accordingly, this Court **GRANTS** the defendants summary judgment on this claim and **DENIES** the plaintiff summary judgment.

### 3. The degree of Due Process afforded to the plaintiff satisfies Article III, § 10 of the West Virginia Constitution.

47)     The West Virginia Supreme Court of Appeals examined the scope of the procedural Due Process guaranteed by Article III, § 10 of the West Virginia Constitution in ***State ex rel. Jeanette H. v. Pancake***, 207 W.Va. 154, 529 S.E.2d 865 (2000):

> Applicable standards for procedural due process, outside the criminal area, may depend upon the particular circumstances of a given case. However, there are certain fundamental principles in regard to procedural due process embodied in Article III, Section 10 of the West Virginia Constitution, which are; First, the more valuable the right sought to be deprived, the more safeguards will be interposed. Second, due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as large a measure of procedural due process protection as a permanent deprivation.

***Id***. at Syl. Pt. 9 (internal citation omitted).

48)     Although the West Virginia Supreme Court of Appeals has yet to define the scope of procedural Due Process with regard to a public school student's suspension, the Court has "consistently held that the West Virginia Constitution is at least as solicitous of individual rights as its federal counterpart . . ." ***Weaver v. Shaffer***, 170 W.Va. 107, 111, 290 S.E.2d 244, 248 (1980) (internal citations omitted).

49)     In ***Schupbach v. Newbrough***, 173 W.Va. 156, 158, 313 S.E.2d 432, 435 (1984), the West Virginia Supreme Court of Appeals noted that, "[t]he due process clauses of our State and Federal Constitutions afford parties the procedural rights of **notice and opportunity to be heard**." (emphasis added) (internal citations omitted).

50)     Because the procedural Due Process requirements under the 14th Amendment to the United States Constitution set forth in ***Goss***, *supra*, are entirely consistent with the procedural Due Process framework under Article III, § 10 of the

West Virginia Constitution enunciated in **Pancake** and **Schupbach**, *supra*, the plaintiff received all the process she was due under the West Virginia Constitution.

51)    Thus, the plaintiff fails to present a genuine issue of material fact with regard to her Article III, § 10 procedural Due Process claim. Accordingly, this Court **GRANTS** the defendants summary judgment and **DENIES** the plaintiff summary judgment as to this claim.

> **B.    Plaintiff failed to present a genuine issue of material fact with regard to her Equal Protection claims under the 14th Amendment to the United States Constitution or Article III, § 10 of the West Virginia Constitution because the plaintiff failed to come forward with any evidence that she was treated differently than others similarly situated.**

52)    The plaintiff claims that Defendants violated her Equal Protection rights under both the United States and West Virginia Constitutions.

53)    Specifically, the plaintiff claims that the defendants, through their disciplinary action against her, treated her differently than other students who committed similar transgressions and thus is essentially asserting a "class of one" Equal Protection claim under both the United States and West Virginia Constitutions.

> **1.  The plaintiff failed to produce any evidence with regard to the elements of a "class of one" equal protection claim under the 14th Amendment to the United States Constitution.**

54)    In **Willis v. Town of Marshall, N.C.**, 426 F.3d 251 (4th Cir. 2005), the Fourth Circuit Court of Appeals, citing **Village of Willowbrook v. Olech**, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000), stated:

> [t]he Supreme Court has recognized the validity of "class of one" Equal Protection claims, "where the plaintiff alleges that she has been **intentionally treated differently** from **others similarly situated** and that there is **no rational basis for the difference** in treatment."

*Willis*, 426 F.3d at 263, (internal citation omitted)(emphasis added). Thus, there are four elements to a "class of one" Equal Protection claim: (1) treatment that is intentionally; (2) different; (3) from others similarly situated; (4) without a rational basis for the difference. *Id*.

55)     In the case at bar, the plaintiff failed to present a genuine issue of material fact with regard to any of the elements required to sustain a cause of action for a "class of one" Equal Protection claim.

56)     First, the plaintiff neither alleged nor produced any evidence whatsoever that the defendants *intentionally* treated her differently from anyone.  *See id*.

57)     Second, the plaintiff failed to present any evidence that she was treated *differently* from anyone else. *See id*.

58)     Third, the plaintiff failed to provide any evidence that there were other students that were treated differently under circumstances similar to hers. *See id*.

59)     Specifically, the plaintiff was required to show that at least one other student created a publicly accessible chat room that singled out another student for bullying, harassment, and intimidation, and encouraged others to join the group but received a less severe punishment than the plaintiff or no punishment at all.

60)     Although the plaintiff claims to recall one occasion where one student insulted another on MySpace, and the defendants allegedly declined to punish the offending student, the plaintiff could not remember even the name of the student that purportedly made the derogatory comment. [Doc. 104-2] at 197.

61)     The plaintiff's incomplete and questionable memory of a situation where one student may have made a negative comment to another student on MySpace falls

far short of demonstrating any similarity between that occasion and the plaintiff's acts of creating a chat room and inviting others to join in her contempt for and derision of another classmate, whom was portrayed as a "slut" with herpes.

62)    Fourth, even if the Court were to accept plaintiff's questionable recollection of an unpunished incident of student name calling on MySpace, the plaintiff failed to present any admissible evidence that there was no rational basis for the difference in treatment. *See id*.

63)    Because the plaintiff failed to present any admissible evidence to support a single element of her "class of one" Equal Protection claim, her claim fails as a matter of law. *See **Willis**, supra*.   Accordingly, this Court hereby **GRANTS** the defendants summary judgment on the plaintiff's 14th Amendment Equal Protection claim.

### 2. The plaintiff failed to produce any evidence with regard to the elements of a "class of one" Equal Protection claim under Article III, § 10 of the West Virginia Constitution.

64)    The West Virginia Supreme Court of Appeals examined the scope of Equal Protection guaranteed by Article III, § 10 of the West Virginia Constitution in ***Robertson v. Goldman***, 179 W.Va. 453, 369 S.E.2d 888 (1988). "The concept of equal protection of the laws is inherent in article three, section ten of the West Virginia Constitution, and the scope and application of this protection is coextensive or broader than that of the Fourteenth Amendment to the United States Constitution." *Id.* at Syl. Pt. 3.

65)    The West Virginia Supreme Court of Appeals has yet to address a "class of one" Equal Protection claim; however, there are no indications that the Equal

Protection Clause of Article III, § 10 of the West Virginia Constitution would be construed more broadly than its Federal counterpart.

66)     In fact, in *Marcus v. Holley*, 217 W.Va. 508, 618 S.E.2d 517 (2005), the West Virginia Supreme Court of Appeals provided the following overview of Equal Protection analysis under Article III, § 10 of the West Virginia Constitution:

> In *Lewis*, this Court explained the three types of equal protection analyses. "First, when a suspect classification, such as race, or a fundamental, constitutional right, such as speech, is involved, the legislation must survive 'strict scrutiny,' that is, the legislative classification must be necessary to obtain a compelling state interest. *Deeds v. Lindsey*, 179 W.Va. 674, 677, 371 S.E.2d 602, 605 (1988)." 185 W.Va. at 691, 408 S.E.2d at 641. In the second type of analysis, "a so-called intermediate level of protection is accorded certain legislative classifications, such as those which are gender-based, and the classifications must serve an important governmental objective and must be substantially related to the achievement of that objective." *Id.*, 408 S.E.2d at 641. "Third, all other legislative classifications, including those which involve economic rights, are subjected to the least level of scrutiny, the traditional equal protection concept that the legislative classification will be upheld if it is reasonably related to the achievement of a legitimate state purpose." *Id.*, 408 S.E.2d at 641.

*Marcus*, 217 W.Va. at 523.

67)     Federal Equal Protection jurisprudence is nearly identical to the framework described in *Marcus*. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562 (1976) (strict scrutiny applies only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class); *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 121 S.Ct. 2053 (2001) (intermediate standard applied to gender-based classification); and *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096 (1993) (rational basis standard applied to social and economic policy).

68)     Due to the high degree of similarity in Equal Protection jurisprudence between Article III, § 10 of the West Virginia Constitution and the 14th Amendment to the United States Constitution, the failure of the plaintiff's Federal Equal Protection claim forecloses her West Virginia Equal Protection claim. Accordingly, the Court hereby **GRANTS** the defendants summary judgment on said claim.

**C.     Plaintiff failed to present a genuine issue of material fact with regard to her Equal Protection under the 14th Amendment to the United States Constitution or Article III, § 10 of the West Virginia Constitution against the defendants, in their official capacity, because she failed to produce any evidence to support the elements of an official capacity claim.**

69)     In suing Berkeley County Public Schools, which the plaintiff also refers to in her Amended Complaint as the "Defendant School Board," the plaintiff is suing a political subdivision. *See* **Bender v. Glendenning**, 632 S.E.2d 330, 219 W.Va. 174 (2006) (noting that school boards are political subdivisions).

70)     The United States Supreme Court has unambiguously stated "that official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" **Hafer v. Melo**, 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991) (quoting **Kentucky v. Graham**, 473 U.S. 159, 165, 105 S.Ct. 3099, 3104 (1985)).

71)     In other words, a suit against a government official in his or her official capacity is tantamount to a claim against the governmental entity itself. Thus, the plaintiff's official capacity claims against each of the defendants who are natural persons are also claims against Defendant Berkeley County Public Schools.

72)     In **Monell v. Dept. of Social Services**, 436 U.S. 658 (1978), the United States Supreme Court stated:

> We conclude, therefore, that a local government may not be sued under §
> 1983 for an injury inflicted solely by its employees or agents. Instead, it is
> when **execution of a government's policy or custom**, whether made by
> its lawmakers or by those whose edicts or acts may fairly be said to
> represent official policy, **inflicts the injury that the government as an
> entity is responsible under § 1983**.

*Monell*, 436 U.S. at 694 (emphasis added).

73)     Thus, for the plaintiff to succeed on her official capacity claims, she must

demonstrate that Defendant Berkeley County Public Schools had a policy or custom

that caused her alleged constitutional injury.

74)     As noted above in §§ A(1)-(3) and B(1)-(2), none of the plaintiff's rights

under either the United States or the West Virginia Constitutions were violated.

Therefore, the plaintiff presents no genuine issue of material fact regarding her claim

that Defendant Berkeley County Public Schools had a policy or custom that caused her

alleged constitutional injury. Accordingly, this Court hereby **GRANTS** the defendants

summary judgment as to this claim.

> **D.     Plaintiff failed to present a genuine issue of material fact with
> regard to her supervisory liability claim against Defendants Manny P.
> Arvon, II, and Rick Deuell, in their official capacity, because there is
> no such cause of action under either state or federal law.**

75)     The plaintiff's claim for supervisory liability against Defendants Manny P.

Arvon, II, and Rick Deuell fails as a matter of law because there is no such cause of

action under either state or federal law.

76)     This issue was recently considered by the West Virginia Supreme Court

on certified question in *Robinson v. Pack*, 223 W.Va. 828, 679 S.E.2d 660 (2009).  In

determining that no cause of action existed for supervisory liability under the 42 U.S.C.

§ 1983, the Court stated:

In the recent decision of in ***Ashcroft v. Iqbal***, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), a case filed by a Pakistani Muslim in connection with his arrest and detention following the September 11, 2001, attacks, the United States Supreme Court addressed the issue of supervisory liability in the federal analog to a section 1983 case, otherwise known as a ***Bivens*** case. Addressing the issue of vicarious liability, the high court stated:

> [R]espondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.... **Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.**

--- U.S. at ----, 129 S.Ct. at 1948.

**The Supreme Court expressly rejected the contention that "'knowledge and acquiescence [by supervisors] in their subordinates' use of discriminatory criteria to make classification decisions among detainees'" was sufficient to find that the supervisors had committed a constitutional violation.** *Iqbal*, --- U.S. at ---, 129 S.Ct. at 1949. Concluding that "the term 'supervisory liability' is a misnomer" in a section 1983 suit or a ***Bivens*** suit, the high court determined:

> Absent vicarious liability, each Governmental official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose ***Bivens*** liability on the subordinate for unconstitutional discrimination; **the same holds true for an official charged with violations arising from his or her superintendent responsibilities**.

***Id***. at ----, 129 S.Ct. at 1949.

. . . .

**As it stands today, the issue of supervisory liability in connection with an alleged civil rights violation is clear: there is none**. Under the holding of ***Ashcroft v. Iqbal***, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), a supervising police officer may not be held liable for the wrongful actions of his or her subordinate officers in connection

with an alleged civil rights violation because a supervising police officer is only liable for his or her own conduct and not that of his/her subordinates.

*Robinson*, 679 S.E.2d at 668 (emphasis added).

77)     Based on the unequivocal rejection of supervisory liability in civil rights cases by both the United States Supreme Court and the West Virginia Supreme Court of Appeals, the plaintiff's § 1983 supervisory liability claim fails as matter of law. Accordingly, this Court hereby **GRANTS** the defendants summary judgment on this claim.

> **E.     Defendants, in their individual capacity, are entitled to statutory immunity under 20 U.S.C. § 6301, *et seq.*, the Elementary and Secondary Education Act, from the Federal claims asserted against them.**

78)     In January of 2002, 20 U.S.C. § 6301, the Elementary and Secondary Education Act, commonly referred to as the "No Child Left Behind" law ("Education Act"), took effect.

79) The Education Act applies to teachers, officers (including school board members), and employees of the school district. Sections 6731-6738 of the Education Act contain the Paul D. Coverdell Teacher Protection Act of 2001 ("Protection Act").

80)     The term "Teacher" is defined in  § 6733(6):

The term "teacher" means--
    (A) a teacher, instructor, principal, or administrator;
    (B) another educational professional who works in a school;
    (C) a professional or nonprofessional employee who—
        (i) works in a school; and
        (ii)(I) in the employee's job, maintains discipline or ensures safety; or
        (II) in an emergency, is called on to maintain discipline or ensure safety; or
    (D) an individual member of a school board (as distinct from the board).

81)     Section 6736 defines the limitations on the liability of teachers:

(a) Liability protection for teachers

Except as provided in subsection (b) of this section, no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if--

    (1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;

    (2) the actions of the teacher were carried out in conformity with Federal, State, and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;

    (3) if appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the State in which the harm occurred, where the activities were or practice was undertaken within the scope of the teacher's responsibilities;

    (4) the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher; and

    (5) the harm was not caused by the teacher operating a motor vehicle, vessel, aircraft, or other vehicle for which the State requires the operator or the owner of the vehicle, craft, or vessel to--

        (A) possess an operator's license; or

        (B) maintain insurance.

82)     In the present case, each of the natural persons named as Defendants meet the definition of "Teacher" under the Protection Act and, therefore, qualify for protection thereunder.

83)     First, the plaintiff has made no allegations that the defendants were acting outside of the scope of their employment or responsibilities.

84)    Second, as noted above in §§ A(1)-(3) and B(1)-(2), the defendants' actions were in conformity with federal and state laws in furtherance of efforts to control, discipline, and suspend the plaintiff and maintain order and control in the classroom or school.

85)    Third, the plaintiff has produced no evidence whatsoever that the defendants imposed her suspension through willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the plaintiff's rights.

86)    Because the defendants are entitled to the liability protection afforded to teachers under 20 U.S.C. §§ 6731-6738, the plaintiff's Federal claims against the defendants, in their individual capacity, fail as a matter law. Accordingly, this Court hereby **GRANTS** the defendants summary judgment as to this claim. *See **C.B. v. Sonora School Dist.**,* --- F.Supp.2d ----, 2009 WL 3077989 (E.D. Cal. 2009) (finding that school defendants were entitled to statutory immunity under 20 U.S.C. § 6731, *et seq.*, from the plaintiff's claim for intentional infliction of emotional distress).

**F.    The defendants are entitled to common law qualified immunity from the Federal claims asserted against them.**

87)    The plaintiff claims that the defendants violated their 5th and 14th Amendment rights under the United States Constitution.

88)    Thus, the federal qualified immunity standard applies to Plaintiff's federal constitutional claims. Because the plaintiff failed to present a genuine issue of material fact regarding her claims that the defendants violated the plaintiff's 5th and 14th Amendment rights under the United States Constitution, this Court hereby **GRANTS** the defendants summary judgment as to the plaintiff's Federal claims.

### 1.    Federal Qualified Immunity Standard

89)    When a plaintiff sues a member of a board of education or school official in that person's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from that person.

90)    If sued "individually," a member of a board of education or school official may raise an affirmative defense of qualified immunity. *See* **Wood v. Strickland**, 420 U.S. 308, 95 S.Ct. 992 (1975) and **Meeker v. Edmundson**, 415 F.3d 317 (4th Cir. 2005).

91)    The test for qualified immunity was announced by the Supreme Court in **Harlow v. Fitzgerald**, 457 U.S. 800, 102 S.Ct. 2727 (1982):

> Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**Id**., 457 U.S. at 818.

92)    The qualified immunity test is one of objective legal reasonableness, without regard to whether the Government official involved acted with subjective good faith. Courts look to whether a reasonable official could have believed his or her conduct to be lawful in light of "clearly established" law and the information possessed by the official at the time the conduct occurred.  **Swint v. City of Wadley, Ala.**, 51 F.3d 988, 995 (11th Cir. 1995).

93)    Even if this Court finds that the right was "clearly established" at the time of the alleged violation, which it does not, a defendant will still be entitled to qualified immunity if the defendant's conduct was "objectively reasonable in light of 'clearly established' law at the time of the violation."  **Chiu v. Plano Indep. Sch. Dist.**, 339 F.3d

273, 279 (5th Cir. 2003)(quoting **Siegert v. Gilley**, 500 U.S. 226, 231-32, 111 S.Ct. 1789 (1991).

94)     The Fifth Circuit Court of Appeals has analyzed immunity as it applies to school officials.  "[A] reasonable school official facing this question for the first time would find no "pre-existing" body of law from which he could draw clear guidance and certain conclusions.  Rather, a reasonable school official would encounter a body of case law sending inconsistent signals as to how far school authority to regulate student speech reaches beyond the confines of the campus.  Given the unsettled nature of First Amendment law as applied to off-campus student speech inadvertently brought on campus by others, the contours of [Ms. Kowalski's] right to First Amendment protection in the present case cannot be deemed 'clearly established' such that it would be clear to a reasonable [Mussellman High School] official that sanctioning [Ms. Kowalski] based on the content of [the webpage] was unlawful under the circumstances.  Thus, the [defendants] are entitled to qualified immunity."  **Porter v. Ascension Parish School Board**, 393 F.3d 608, 620 (5th Cir. 2004); *see also* **Morse v. Frederick**, 551 U.S. 393, 127 S.Ct. 2618 (2007)(landmark United States Supreme Court decision affording qualified immunity to school principal for quick decision which forced students to take down banner reading "BONG HITS 4 JESUS" at a school sponsored function).

95)     Under **Porter**, because a reasonable school official might find the webpage subject to a **Tinker** analysis, to deny any measure of immunity in these circumstances would serve not to contribute to principled and fearless decision-making on behalf of school officials, but rather lead to intimidation in the face of uncertainty. *See* **Wood v. Strickland**, 420 U.S. 308, 319, 95 S.Ct. 992 (1975).

96) "Thus, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" **Swint**, 51 F.3d at 995.

97) Furthermore, the contours of a right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. **Id**.

### 2. Immunity is properly determined pre-trial.

98) In **Saucier v. Katz**, 533 U.S. 194, 121 S.Ct. 2151 (2001), the United States Supreme Court highlighted the need to determine the question of immunity before trial, emphasizing that "immunity is an entitlement not to stand trial" rather than a defense from liability. The Court noted the importance of curtailing the burden of responding to frivolous suits:

> [N]ot all such suits are meritorious. Many are marginal and some are frivolous. Yet even when the risk of ultimate liability is negligible, the burden of defending such lawsuits is substantial. . . . This diversion of officials from their normal duties and the inevitable expense of defending even unjust claims is distinctly not in the public interest.

**Id**. See also **Town of Newton v. Rumery**, 480 U.S. 386, 396 (1987) and **Pritchett v. Alford**, 973 F.2d 307, 313 (4th Cir. 1992).

### 3. The defendants are entitled to qualified immunity from the plaintiff's Federal claims.

99) The defendants are entitled to qualified immunity from the plaintiff's claims under the United States Constitution. As discussed above in §§ A(1)-(2) and B(1), the plaintiff failed to present a genuine issue of material fact regarding the alleged violation of her 5th and 14th Amendment rights under the United States Constitution. See **Harlow**, supra. Accordingly, the Court hereby **FINDS** that the defendants are entitled to qualified immunity from the plaintiff's claims under the United States Constitution.

**G.    The defendants are entitled to statutory immunity under West Virginia Code § 29-12A-1, *et seq.*, the Governmental Tort Claims and Insurance Reform Act, from the state claims asserted against them.**

100)    In 1986, the West Virginia Legislature enacted *The Governmental Tort Claims and Insurance Reform Act* ("The Act"), the stated purposes of which are "to limit liability of political subdivisions and provide immunity to political subdivisions in certain instances and to regulate the costs of insurance available to political subdivisions for such liability."  W.Va. Code § 29-12A-1.

101)    A political subdivision includes "any public body charged by law with the performance of a governmental function . . .."  W.Va. Code § 29-12A-3(c).  The defendants in the case at bar are each employed by the Berkeley County Board of Education and, therefore, immunity for political subdivisions extends to them.

102)    Justice Cleckley, writing for a unanimous Court in **Hutchison**, *supra*, clearly expressed the judicial policy supporting dismissal of claims asserted against the employees of a political subdivision. "The public interest is that the official conduct of the officer is not to be impaired by constant concern about personal liability." **Hutchison**, 479 S.E.2d at 658.

103)    "The policy considerations driving such a rule are straightforward: public servants exercising their official discretion in the discharge of their duties cannot live in constant fear of lawsuits, with the concomitant costs to the public servant and society." *Id*.

104)    The Act expressly prohibits a direct claim of personal liability from being asserted against an employee of a political subdivision unless at least one of three exceptions apply. West Virginia Code § 29-12A-5(b)(2) states:

> An employee of a political subdivision is immune from liability unless one of the following applies:
>
> (1)     his or her acts or omissions are manifestly outside the scope of employment or official responsibilities;
>
> (2)     his or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner or;
>
> (3)     liability is expressly imposed upon the employee by a provision of this Code.

105)   In the case at bar, the plaintiff has made no argument that the defendants were acting in any capacity other than as school officials, and there is no argument that an express provision under the Act imposes liability. This leaves only exception: (2).

106)   The plaintiff submitted no evidence to support a claim that the defendants acted maliciously, in bad faith, or in a wanton and reckless manner when they disciplined the plaintiff.

107)   Conversely, the evidence clearly demonstrates that the plaintiff was legitimately punished for her own malicious, wanton, and reckless conduct. The plaintiff admittedly created a chat room that singled out another student for bullying, harassment, and intimidation; the plaintiff was on notice that her conduct could lead to disciplinary action; and the plaintiff received notice, an opportunity to be heard prior to her suspension, and an opportunity to appeal her suspension.

108)   These factors clearly demonstrate that the defendants' actions were not taken maliciously, wantonly, recklessly, or in bad faith. For these reasons, this Court hereby **FINDS** that the defendants are entitled to statutory immunity from the plaintiff's state claims. *See* W.Va. Code § 29-12A-5(b)(2).

**H.     The defendants are entitled to common law qualified immunity from the state claims asserted against them.**

109)   The plaintiff claims that the defendants violated her Due Process Rights and Equal Protection rights under the West Virginia Constitution.

110)   Thus, the West Virginia qualified immunity standard applies to plaintiff's state constitutional claims.

111)   Because the plaintiff failed to present a genuine issue of material fact regarding her claim that the defendants violated any of the plaintiff's rights under the West Virginia Constitution, this Court hereby **GRANTS** the defendants summary judgment on the plaintiff's state claims.

### 1.     State Qualified Immunity Standard

112)   West Virginia's qualified immunity standard is modeled after its federal counterpart. In Syllabus Point 3 of ***Robinson v. Pack***, 223 W.Va. 828, 679 S.E.2d 660 (2009), the West Virginia Supreme Court stated, "Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

### 2.     Immunity is properly determined pre-trial.

113) The West Virginia Supreme Court of Appeals endorses the United States Supreme Court's jurisprudence regarding the early determination of entitlement to qualified immunity. In ***Hutchison v. City of Huntington***, 198 W.Va. 139, 479 S.E.2d 649 (1996), Justice Cleckley wrote:

> Immunities under West Virginia law are more than a defense to a suit in that they grant governmental bodies and public officials the right not to be subject to the burden of trial at all. The very heart of the immunity defense

37

is that it spares the defendant from having to go forward with an inquiry into the merits of the case. *See Swint v. Chambers County Commission*, 514 U.S. 35, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). . . .

*Id.* at 658.

114)   Like the United States Supreme Court, the West Virginia Supreme Court of Appeals has noted the importance of curtailing the burden of responding to frivolous suits:

> The policy considerations driving such a rule are straightforward: public servants exercising their official discretion in the discharge of their duties cannot live in constant fear of lawsuits, with the concomitant costs to the public servant and society. Such fear will stymie the work of state government, and will "dampen the ardor of all but the most resolute, or the most irresponsible, [public officials] in the unflinching discharge of their duties." ("The public interest is that the official conduct of the officer is not to be impaired by constant concern about personal liability"). The doctrine of qualified and statutory immunity was created to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.

*Id.* (Internal citations omitted.)

### 3. The defendants are entitled to qualified immunity from the plaintiff's state claims.

115)   The defendants are entitled to qualified immunity from the plaintiff's claims under the West Virginia Constitution. As discussed above in §§ A(3) and B(2), the plaintiff failed to present a genuine issue of material fact regarding the alleged violation of her Article III, § 10 rights under the West Virginia Constitution. *See Robinson*, *supra*. Accordingly, this Court hereby **FINDS** that the defendants are entitled to qualified immunity from the plaintiff's claims under the West Virginia Constitution.

**I.    Plaintiff failed to present a genuine issue of material fact with regard to her claim for injunction because the defendants have not and do not forward disciplinary records to other institutions.**

116)    The plaintiff claims that she is entitled to an injunction requiring the defendants to expunge the disciplinary action at issue in this case from her school record and to send corrected records to any third parties who may have received any information regarding the disciplinary action at issue in this case.

117)    The plaintiff's suspension was a valid exercise of the defendants' authority to enforce is policy prohibiting the bullying, harassment, and intimidation of students.

118)    The plaintiff admitted to creating the chat room at issue in this case and signed a Student Disciplinary Referral Form associated therewith.

119)    Because the plaintiff was legitimately punished pursuant to established school policy, she is not entitled to have her disciplinary record expunged.

120)    Additionally, Brenda Christian, who was employed as the Guidance Secretary/Registrar for Musselman High School at all times relevant to the plaintiff's claims, provided an affidavit which explains that only the plaintiff or her parents can authorize the release of her disciplinary records. See Affidavit of Brenda Christian [Document 104-7] at ¶ 6.

121)    Ms. Christian also reviewed records maintained by Musselman High School concerning the release to the plaintiff's records and confirmed that the only record released was the transcript of the plaintiff's grades, which was sent to Shepherd University on June 16, 2006.  See id. at ¶10.

122)    Because the plaintiff's punishment was legitimately imposed and because her disciplinary records have never been released and can only be released by her own

authorization, the plaintiff's claim for injunction fails as a matter of law. Therefore, this Court hereby **GRANTS** the defendants summary judgment regarding this claim.

## VII.    <u>CONCLUSION</u>

Based on the foregoing reasoning, this Court finds that the Defendants' Motion for Summary Judgment **[Doc. 104]** should be, and hereby is, **GRANTED**. The Court also finds that the Plaintiff's Motion for Summary Judgment on Issue of Violation of Due Process Rights **[Doc. 105]** should be, and hereby is, **DENIED**. As such, it is **ORDERED** that the plaintiff's remaining claims be **DISMISSED with prejudice**, and the above-styled case be **STRICKEN** from the active docket of this Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**:  December 22, 2009.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

40